SPAULDING MANUFACTURING COMPANY, et al. Appellant v. CITY OF GRINNELL, et al. Appellees.

Municipal corporations: WATER SUPPLY: REFUSAL TO PAY RENT: DISCONNECTION: INJUNCTION: EVIDENCE. A city owning the water supply is entitled to compensation for water correctly metered to a consumer, regardless of its use, or leakage and waste for which the consumer is directly responsible. In this action to restrain the city from cutting off plaintiff's water supply the evidence is held to show that the difference between the quantity of water metered and plaintiff's estimate of that consumed was due to a leak in plaintiff's system.

**Same:** PRESUMPTION: BURDEN OF PROOF. Where parties agree upon
2  the use of a meter to measure the water supply the meter read-
ings will be presumed to be correct; and when the correctness is
disputed by the consumer he has the burden of proof on that
question.

**Same:** WATER RENTS: GOOD FAITH DISPUTE: DISCONNECTION FOR NON-
3  PAYMENT: INJUNCTION. Where a consumer of water refuses to
pay therefor when due, the city, under an ordinance authorizing
it, may cut off the supply; but where there is a good faith dispute as
to the amount due this summary remedy to enforce payment
should not be applied without an investigation as to the cause of
apparently exorbitant bills and an attempt to remedy the trouble;
and when disconnection is attempted under such circumstances
a temporary injunction may properly be issued.

**Same:** INJUNCTION: DAMAGES. In an action to enjoin a threatened dis-
4  continuance of a consumer's water supply, and for other relief, the
result of a dispute as to charges, a finding as to the amount due is
necessary, although the defendant did not ask for judgment: And
in such a case the defendant is not entitled to damages on the
injunction bond after dissolution of the temporary writ.

*Appeal from Superior Court of Grinnell.*—HON. J. P.
LYMAN, Judge.

THURSDAY, JUNE 6, 1912.

SUIT in equity to enjoin defendants from cutting off
plaintiff's water supply and for other relief. A temporary
writ was ordered, and upon trial to the court the temporary
writ was dissolved, a permanent injunction denied, and
plaintiff was found to be indebted to defendant for water
furnished down to the time of the commencement of the
suit in the sum of $557.05. Plaintiffs appeal.—*Affirmed*,
with modification at plaintiffs' election.

*A. C. Lyon* and *P. G. Norris* for appellants.

*H. L. Byer* and *Will C. Rayburn* for appellees.

DEEMER, J.—The defendant city owns and operates a

municipal waterworks system, and plaintiff, a large manufacturing concern has been one of its patrons for many years. In April of the year 1910, the meter was read, and plaintiff was presented with a bill for the preceding six months amounting to $142.90. This was much larger than any previous bill for many years at least, and a controversy arose over the bill. A rough test was made of the meter and the conclusion arrived at that it was one-tenth fast, and the bill was discounted ten percent. Thereafter another preliminary reading was made on July 2d, and this showed a large increase in the consumption of water, and the meter was again read on October 10, 1910, to secure the data for the November bill. This reading showed the sum of $618.95 due for water for practically two-quarters, or six months. This was an increase over the previous bill, and another controversy arose. A new meter was installed, and the old one was again tested, and the conclusion was that it was running ten percent fast. The $618.95 bill was then reduced ten percent, or to $557.05, and payment thereof demanded from plaintiff. Instead of complying with the request, plaintiff tendered the sum of $53.25 in full payment of the account, which amount the city refused to accept. Plaintiff having refused to pay the city more than the amount tendered, the city ordered the water cut off, and was in the act of doing so when this action in equity was commenced, to restrain the defendants, its officers and agents, from cutting off the water. A temporary writ was issued and thereafter the city moved to dissolve the same; but its motion was denied. The case came on in regular order for trial at the regular February term of court, resulting in a decree dissolving the temporary writ of injunction and dismissing the petition. The court also found that the amount due from the plaintiff to the city was $557.05, but no judgment was rendered for the amount so found due.

The questions presented on this appeal are largely

of fact, and have to do primarily with the amount of water which the city supplied to the plaintiff during the periods in controversy. The water was metered to the plaintiff, and for any leaks after the water passed the meter plaintiff is responsible. It is quite clear from the testimony that there must have been some leaks in plaintiff's system for at least a part of the time in question. Many things confirm this conclusion, and we think there is practically no dispute over the proposition. To what extent these leaks contributed to plaintiff's loss and augmented the bills presented by the city it is difficult to say with any degree of accuracy. One fact stands out very prominently in the case. It is conceded that the amount of water actually consumed by plaintiff for the years 1908, 1909, and 1910 was practically the same for each year or for each six months of these years. But on account of a slow or defective meter, the meter readings grew constantly less from May, 1908, down to November 1, 1909, when the meter "went dead," and the amount consumed during the six months from May to November, 1909, was estimated. A new meter was installed shortly after the old one failed, and when it was read preparatory to making out the bill for May, 1910, the amount consumed immediately jumped up to $142.90, and with the presentation of the bill for May the controversy began.

That this matter may be fully understood, we here reproduce in tabulated form the results of the different readings from May 1, 1908, down to and including November 1, 1910: (See next page.)

A glance at this table will indicate our thought. Back of the year 1908 we have no data; but it is apparent from the concessions made by counsel that the meter which was in place from May, 1908, down to some time in November, 1910, was a slow one, and that it finally *went dead*. So that we have no reliable data

*Marginal note:* 1. MUNICIPAL CORPORATIONS: water supply: refusal to pay rent: disconnection: injunction: evidence.

| Date Period Ending. | Days Included. | Meter Readings. | Total Cu. Ft. | Cu. Ft. Per Day. | Total Gals. | Gallons per | | | Paid. | Amt. Claimed. |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Day | Hour | Min. | | |
| May 1, 08 | 180 | 568 378 544 840 | 23 538 | 130' | 176 076 | 978 | 40.75 | .67 | $ 56.95 | |
| Nov. 1, 08 | 180 | 679 300 568 378 | 10 922 | 60 | 81 702 | 453 | 18.8 | .31 | 28.63 | |
| May 1, 09 | 180 | 589 360 679 300 | 10 060 | 56 | 75 254 | 418 | 17.4 | .29 | 26.20 | |
| Nov. 1, 09 | 180 | 589 360 Meter Dead. | Esti-mated. 9 769 | 54 | 73 000 | 405 | 16.89 | .28 | 25.00 | |
| May 1, 10 (Apr. 18) | 180 | 0 61 870 | 61 870 | 343 | 462 870 | 2 572 | 107.17 | 1.78 | 123.71 | $142.90 |
| Nov. 1, 10 (Oct. 10) | 174 | 325 840 61 870 | 273 970 | 1575 | 2 049 438 | 11 778 | 490 75 | 8.18 | | $513.95 |
| Intermediate Reading on July 1, 1910 | 73 | 310 190 61 870 | 248 320 | 3401 | 1 858 178 | 25 454 | 1060 | 17.66 | | |

whereby to discover the exact amount of water consumed or passing through a perfect meter prior to the year 1910. It was conceded on oral argument, however, that the meter installed some time before July 1, 1910, was correct in its measurement, and that the amount of water consumed by plaintiff from July 1, 1910, the date of the intermediate reading down to October 10th of the same year, according to the table heretofore set out, is approximately correct. This amounted to 25,650 cubic feet, or approximately 192,425 gallons in about three months, which would make the actual amount of consumption less than from April to October, 1910. These figures are the nearest approach we have to anything like accurate meter readings. If this be correct, then it is apparent that the meters were at fault from the time the new one was installed, immediately after the one failed, during the period from May to November, 1, 1909, down to July 1, 1910, or that there were leaks in plaintiff's system of piping at some place after the water passed the meter. A new meter was installed just after the one was found dead at the time of the reading for November, 1909, and this was the

meter which was read April 18, 1910. When the controversy arose over the bill presented for May, the matter was allowed to run until the last of June, when the meter was given the rough test hitherto indicated, and an intermediate reading was then made on July 1 or 2, 1910, which showed a consumption of 248,320 gallons after April 18th of the same year. This led to an immediate overhauling of the piping in the factory. After this was done, plaintiff wrote the city clerk as follows:

Grinnell, Iowa, Sept. 5, 1910. City Clerk, Grinnell, Iowa.—Dear Sir: In connection with the bills which you have sent us for water used at our plant, we wish to call your attention to the amount of the bill for the west shop, date of bill being May 1, 1910. You will notice that this amount is $142.90, which is almost six times as much as the amount for any preceding six months back as far as May 1, 1908. Upon receipt of this bill we at once made investigation and found that with all the water cut off the meter was still running, which shows that there must have been a leak. We have gone over all our pipes and cut off a great many which were not in use, and we believe we have stopped this leakage wherever it was. We wish you would kindly take this matter up before the city council at their next meeting, as we believe that under the circumstances they will feel we are entitled to a reduction from this bill. You will notice that the boiler room, east shop, and office bills are practically the same amounts as heretofore. We shall be glad to hear from you after taking this up with the council, and thanking you in advance for your prompt attention to this matter, we remain, Yours respectively, Spaulding Mfg. Co. By F. E. Spaulding. OM.

After the reading on October 10, 1910, plaintiff demanded a new meter, and this was furnished by the city, and a new one was installed on November 2, 1910, and the old one was taken to the waterworks and there tested by an employee of the city and a representative of the plaintiff, and it was concluded that it ran about ten percent

fast, and the bill for the previous six months was dis- counted accordingly. Since the meter was installed on November 2, 1910, and down to January 10, 1911, the consumption of water has been approximately 258 cubic feet per day, so that the old meter must have been register- ing correctly during the period from July 1, to October 10, 1911. As already indicated, it is very clear that the piping in plaintiff's plant leaked badly, or that the meter which was put in in November, 1909, and which ran until the new one was installed, some time after the reading on October 10, 1910, was not only faulty, but very erratic. For some reason it seemed to settle down to a correct ren- dering of the flow of water after July 1, 1910, and we are disposed to think, in view of the other testimony, that the change was due to the overhauling which plaintiff gave its pipes referred to in its letter of September 5, 1910, before quoted. When the meter in controversy was taken out in November, 1910, it was given the test at the water plant hitherto referred to, and after this suit was com- menced it was taken to Des Moines and there tested by an expert, who testified that it was of a standard make, and that it registered correctly. This expert was a witness at the trial in the superior court and there testified that the meter was in good condition. He there took it apart and testified that he found everything in good condition. Other experts testified to the same facts. Other witnesses testified that a water meter will not register unless water or air is passing through it.

A strong point in defendants' case is that the meter in controversy from July 1, 1910, to October 10th of the same year, or for a period of one hundred and one days, registered practically the same amount per cubic feet per day as the new meter put in in November of the year 1910 for the sixty-eight days it was in operation. There was no change in this meter in controversy from the time it was installed until replaced in November; but the read-

ing suddenly became approximately correct about the time plaintiff overhauled its piping. Again, it is shown and admitted by all parties that during the period from November, 1909, to July, 1910, the meter would register after plaintiff had done everything it could to shut off the water in its plant. Many of its pipes were concealed, however, and one of them was so arranged with another furnishing soft water that there may have been a leak at this automatic cut-off. But however this may be, one fact stands out so prominently that it can not be overlooked. Without change in the meter, plaintiff, by merely changing its piping system, slowed down the meter so that from July to October of the year 1910 it gave a correct reading. Plaintiff says, however, that if there was such a leak as defendant claims, it would have had some visible effects, and gives figures showing that in the seventy-three days when the leak was so bad, according to the meter readings, it would have formed a lake one hundred and fifty-seven feet long, one hundred and fifty-six feet wide, and ten feet deep. Of course, this is mere speculation, depending on the place of leakage, the character of the soil, etc. No allowance is made for the porosity of the soil, or evaporation, and what is more important, the basis of actual consumption in arriving at the assumed leakage is the mean consumption for the year and one-half preceding the installation of the meter in controversy, during which time it is clear that the meter was at fault in that it did not register more than one-fourth of the water actually consumed. A conclusion is no stronger than its weakest premise, and we think it a demonstration that the major premise in the conclusion which appellants' counsel asks us to draw as to the amount of leakage is entirely incorrect as shown by the conceded facts. Again plaintiff's counsel contend that the pipes could not have carried the amount of water shown to have passed through the meter; but this idea is distinctly negatived by the testimony.

Without endeavoring to say at this time just where some of the leaks may have been, it seems quite probable that one of them may have been in the boiler room, where the .city water system was directly connected up with a soft water one; the city pressure being much higher than that on the soft water system. However, it was not incumbent on the city to point out where the leaks may have been. That there were such we have no doubt. The defective meter could not run unless water or air ran through it, and although it may not have correctly measured the flow—that is, may have run too fast or too slow—it is apparent that there must have been a leak somewhere in plaintiff's piping—elese it would not have measured at all.

The trouble was either a defective meter or a leak in plaintiff's pipes, and we are constrained to hold, as did the learned superior court, that the chief fault was in the piping. On no other theory can the physical facts be harmonized with the testimony.

Defendant city is entitled to compensation for the water correctly metered to plaintiff. It is in no way interested in what the subscriber does with it, provided it is able to supply the demand and is not responsible for any leaks—for these the consumer is directly responsible.

As the parties agreed to a meter measure, the meter readings are presumptively correct. *Poole v. Water Co.*, 81 S. C. 438 (62 S. E. 874, 128 Am. St. Rep. 923); *Mansfield v. Humphrey Co.*, 82 Ohio St. 216 (92 N. E. 233, 31 L. R. A. (N. S.) 301, 19 Am. Cas. 842).

2. SAME: presumption: burden of proof.

The burden then is upon the plaintiff to show that it was incorrect. Of course, this may be done by circumstantial testimony; but the circumstantial testimony here relied upon is not at all conclusive in character. The main fault in plaintiff's argument lies in the fact that his counsel assume that the normal consumption was not more

than seventy-five cubic feet per day, based upon manifestly incorrect readings from May, 1908, to November, 1909, inclusive. The truth, as now admitted, is that the mean normal consumption is approximately two hundred and fifty-eight cubic feet per day, not counting any leakage.

We are also constrained to hold, however, that plaintiff's controversy with the city was in good faith; that the trouble grew out of a slow meter, which finally stopped; 3. SAME: water rents: good faith dispute: disconnection for nonpayment: injunction. that when an approximately correct bill was presented it came as a shock to the plaintiff; and that the plaintiff was entitled to an investigation as to causes without paying what appeared to be exorbitant bills. Instead of threatening to cut plaintiff off for not paying these bills, it should have undertaken an amicable adjustment of the matter and endeavored to ascertain the cause of the trouble. Of course, if a consumer fails and refuses to pay his past-due bills, the city, under its ordinance authorizing the cutting off of its water supply to a customer who failed to pay his bills when due, might adopt this remedy. Farnham on Water Rights, section 164-A. But such a regulation can not be made the instrument whereby a water company may become the judge of its own case and shut off water to enforce the payment of disputed bills. *Hatch v. Co.*, 17 Idaho, 204 (104 Pac. 670); *Webster v. Tel. Co.*, 17 Neb. 126 (22 N. W. 237, 52 Am. Rep. 404); *Borough of Wash. v. Water Co.*, 70 N. J. Eq. 254 (62 Atl. 390); *City v. Mfg. Co.*, 82 Ohio St. 216 (92 N. E. 233, 31 L. R. A. (N. S.) 301), 19 Ann. Cas. 842; *Wood v. City*, 87 Me. 287 (32 Atl. 906, 29 L. R. A. 376).

In view of the situation disclosed by this record, 4. SAME: injunction: damages. we think the temporary writ of injunction was properly issued and the motion to dissolve properly overruled.

When the case went to final trial, the trial court found the amount due from plaintiff to defendant to be $557.05,

but no judgment was rendered for this amount for the reason, no doubt, that defendants did not ask for such judgment. Under the pleadings a finding as to the amount due was necessary, although no judgment was asked, and that finding, being responsive to the issues, was binding upon the parties. Appellant says that judgment should have been rendered against it for the amount found due, and that the trial court was in error in not rendering such judgment. Of course, it is strenuously insisted that the amount found due is excessive and without support in the testimony, and counsel now ask us to render judgment against it for the amount we find due.

Our examination of the record leads to the conclusion that the trial court was right in its finding as to the amount due, and if appellants desire it, appellees not complaining, judgment may be entered in this court for the amount so found due, with costs. If appellant so elects, it may have judgment in this court against itself for the amount found due by filing with the clerk of this court, within twenty days from the promulgation of this opinion, a written election for such judgment, accompanied with a form of judgment and decree; a copy of such notice and decree to be served upon counsel for appellee five days before such decree and judgment is to be entered.

Our conclusion is that, while the temporary injunction was correctly issued, the final decree was correct, and that the restraining order issued by one of the judges of this court was also properly issued. The result of the whole matter, then, is that the final decree is correct, but that appellant may have a modification if he so elects.

Defendants are not entitled to any damages on the injunction bond, nor are they entitled to recover anything because of the restraining order issued by order of one of the judges of this court.

*Affirmed* with *modification* at plaintiffs' election.